IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **CHRISTY C. CARAWAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** 14-cv-312-CJP[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Christy C. Caraway is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

## **Procedural History**

Plaintiff applied for DIB on August 23, 2010. She alleged disability beginning on June 23, 2010. (Tr. 32). After holding a hearing, Administrative Law Judge (ALJ) Stuart T. Janney denied the applications in a decision dated October 11, 2012. (Tr. 32-49). The Appeals Council denied review and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this court.

## **Issues Raised by Plaintiff**

---

[1] This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 28.

Plaintiff raises the following issues:

1. The ALJ improperly weighed medical opinion evidence.

2. The ALJ improperly assessed plaintiff's RFC.

3. The ALJ erred in his credibility determination

### Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step

> compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  See also, *Zurawski v.*

*Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to understand that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber

stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of type I diabetes mellitus with retinopathy and nephropathy, level II obesity with coronary artery disease treated with a coronary artery bypass graft procedure, hyperlipidemia, hypertension, obstructive sleep apnea, hypothyroidism, attention-deficit hyperactivity disorder, and depressive reaction with anxiety.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary level with physical and mental limitations. Based on the testimony of a vocational expert (VE), the ALJ found plaintiff was unable to perform her past work. However, she was not disabled because she was able to do other jobs which exist in significant numbers in the regional and national economies. (Tr. 32-49).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1.  Agency Forms

Plaintiff was born in 1974 and was 35 years old on the alleged onset date of June 23, 2010.  Plaintiff was insured for DIB through December 31, 2014. (Tr. 225).

According to plaintiff, her diabetes, hypothyroidism, kidney and heart problems, and anxiety limited her ability to work. (Tr. 229). Plaintiff previously worked as an accounting clerk for a soda factory, administrative assistant for a non-profit, business assistant for a dental office, and a photo laboratory technician. (Tr. 230).

Plaintiff submitted two Function Reports, one in October 2010 and another in February 2011. (Tr. 245-55, 289-300). Plaintiff stated she was weak and tired all of the time. She stated that it was very painful for her to walk, sit, or stand. (Tr. 245, 289). Plaintiff stated she spent her day eating, watching TV, going to rehab, napping, and talking on the phone. (Tr. 246, 290). Her husband took care of their two cats and two dogs. (Tr. 290). Plaintiff prepared simple meals weekly and was unable to stay on her feet long enough to use the stove. She was able to dust and do some laundry. (Tr. 247, 291).

Plaintiff could walk, drive, and ride in a vehicle. (Tr. 248, 292). She attended church and rehab three times a week. (Tr. 249, 293). She said she had trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, remembering, and completing tasks. She stated she could lift no more than five pounds and could walk two or three blocks before needing to rest. (Tr. 250, 294). Three of plaintiff's medications caused drowsiness or

6

dizziness. (Tr. 251, 296). She occasionally had trouble opening jars and she needed assistance with heavy items. (Tr. 254, 298).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on October 1, 2012. (Tr. 58). She testified that she was 5'5" and weighed 200 pounds. She had a major increase in weight as her normal weight was 125 pounds. She lived with her husband at the time of the hearing. (Tr. 62). Her husband was formerly a coal miner but was laid off and unemployed. She stopped working one and one-half years earlier when she had bypass surgery on five blood vessels. (Tr. 63, 66).

Plaintiff stated she had no insurance or medical card. She was only able to see her endocrinologist because she had a payment plan. Her cardiologist did not charge her for services. (Tr. 70). Plaintiff testified to being type 1 diabetic since the age of ten. (Tr. 66). She had not undergone an A1C procedure since childhood as it was too costly. (Tr. 68). She checked her blood sugar three to six times a day, depending on her levels and how she felt. (Tr. 68, 80). She had been on an insulin pump for fifteen years. (Tr. 69). Her doctor gave her samples of her insulin and otherwise she only took low cost medications. (Tr. 72-3). Plaintiff had retinopathy and had surgery on both of her eyes. (Tr. 69). She did not like to drive because her vision was deteriorating. She testified that she had trouble seeing traffic over her shoulders and had no peripheral vision. (Tr. 90).

Plaintiff stated she had problems with her thyroid. Her thyroid bothered her about once every six months but was otherwise controlled well with medications. (Tr. 69-70). Plaintiff took medications for her high cholesterol and blood pressure. (Tr. 71). Her cholesterol medication, Lipitor, caused her to have muscle spasms and her blood pressure medication caused her to be very tired. (Tr. 73). She also took medication for her anxiety. (Tr. 73). It sometimes improved her problems but she still had trouble handling stress. (Tr. 78). Plaintiff relied on her family, friends, and pastor to help cope with her mental stressors. (Tr. 86).

Plaintiff needed to raise her feet while resting, otherwise they became swollen. (Tr. 85). She occasionally took a water pill to help reduce swelling. (Tr. 71). She saw a nephrologist for her stage two chronic kidney disease which caused swelling and high blood pressure. (Tr. 71-2).

She and her husband rented their home and her husband took care of all the yard work. (Tr. 74). Plaintiff stated that she could dust but had trouble performing most other household chores. (Tr. 74-6). Multitasking was difficult and she needed many breaks to check her blood sugar. (Tr. 79-80).

Three times a week plaintiff attempted to go outside and walk a mile. (Tr. 82). It took her about an hour to walk a mile and she needed occasional stops. (Tr. 83). She needed twelve hours of sleep otherwise she became irritable. (Tr. 84). Plaintiff testified to having trouble using her hands and dropping things frequently. (Tr. 90).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform sedentary work limited to never climbing ladders, ropes, or scaffolding, occasionally stoop, kneel, and crouch, frequently reach, handle, and finger with the bilateral upper extremities. She should avoid concentrated exposure to extreme heat and cold, hazards, unprotected heights. Additionally, she could not work in an environment that was stringently production or quota-based and could not work in a setting that requires shifting between tasks more than once every fifteen minutes. (Tr. 91-100).

The VE testified that the person could not perform any of plaintiff's previous work. However, she could do jobs that exist in significant numbers in the national economy. Examples of such jobs are stuffer, dowel inspector, and surveillance system monitor. (Tr. 97-102). The VE testified that additional unscheduled breaks, needing to elevate the feet at waist height, or the inability to work for an hour in the afternoon, would preclude all employment. (Tr. 104-5).

### 3. Medical Treatment

In February 2010, plaintiff underwent a coronary bypass graft procedure which revealed severe multivessel coronary artery disease with critical stenosis. (Tr. 344-47). She was also diagnosed with stage II chronic kidney disease. (Tr. 729). After surgery plaintiff was discharged in stable condition and was doing well

for several months. (Tr. 378). However, in May 2010 she got pneumonia and she began feeling worse. (Tr. 375).

That July, plaintiff presented at the hospital with nausea, vomiting, tightness in her chest, and high blood sugar. (Tr. 485). Doctors determined plaintiff was in diabetic ketoacidosis and that she suffered a non-ST-elevation myocardial infarction. (Tr. 544-47). Angiographies and a cardiac catheterization revealed plaintiff had severe three-vessel native coronary artery disease, 60% stenosis in the left circumflex coronary artery, and severe 90% stenosis in the right coronary artery, among other things. (Tr. 553).

From 2006 through 2011, plaintiff regularly saw her treating endocrinologist, Dr. Becker. (Tr. 364-421, 562-67, 907-17). Dr. Becker prescribed medications and monitored plaintiff's diabetes and hypothyroidism. (Ex. Tr. 383, 389, 375-6, 913). In September 2010, plaintiff presented to Dr. Becker with swelling in her legs and lightheaded spells. (Tr. 563). Dr. Becker changed her medications to help and thereafter continually noted minimal or trace edema. (Tr. 563, 908, 918). Dr. Becker diagnosed plaintiff with proteinuria in February 2011. He noted plaintiff did not follow her diet and she had gained twelve pounds since her last visit. (Tr. 917). Dr. Becker's records show that plaintiff's BMI ranged from a 28 to a 35 and her diabetes was not well controlled. (Tr. 365, 375, 378, 382, 907-17).   Plaintiff frequently told Dr. Becker she experienced fatigue, depression, and vision problems. (Tr. 565, 599-602, 907-17).

Plaintiff regularly saw her nephrologist, Dr. Kamran. Dr. Kamran diagnosed plaintiff with hyperkalemia and hypercalcemia in September 2010. (Tr. 725). Dr. Kamran determined plaintiff's proteinuria was caused from nephropathy. (Tr. 721). He monitored her prescriptions and had her return every six months for a check-up. (Tr. 495-98, 507-15, 868-70, 833-35).

In April 2011, plaintiff's cardiologist noted plaintiff had generalized edema to her hands and feet that continued throughout the day. It became more significant when she had more salt in her diet. He prescribed a water pill to help keep the edema under control. (Tr. 849-52).

Plaintiff began having neck, shoulder, and back pain in September 2011. (Tr. 912). She began seeing a chiropractor weekly. (Tr. 919-37). The chiropractor noted plaintiff's gait was guarded and her movement was restricted. (Tr. 937). He diagnosed plaintiff with segmental/somatic cervical, thoracic, and lumbar dysfunction, facet's syndrome, and thoracic outlet syndrome. (Tr. 936). The chiropractor noted plaintiff's progress was slow but he was hopeful she would continue to improve. (Tr. 922-26).

In July 2010, plaintiff first presented to her family physician, Dr. Graham, with anxiety. She stated she had apprehension and palpitations nearly every day. (Tr. 788). Dr. Graham diagnosed plaintiff with generalized anxiety and prescribed medications. (Tr. 789-90). Dr. Graham opined that occupational stressors caused her anxiety and that she did not experience true panic attacks. (Tr. 785).

**4. Plaintiff's Treating Physicians' Opinions**

In February 2011, Dr. Becker completed a medical source statement regarding plaintiff's impairments. (Tr. 707-10). Dr. Becker diagnosed plaintiff with diabetes mellitus type 1, retinopathy and proteinuria. He stated plaintiff's symptoms included fatigue, episodic vision blurriness, retinopathy, kidney problems, dizziness/loss of balance, and headaches. He opined plaintiff's impairments would last at least twelve months. (Tr. 707). Dr. Becker felt plaintiff's symptoms would occasionally be severe enough to interfere with attention and concentration and she was incapable of even "low stress" jobs. She could sit for more than two hours but could only stand for thirty minutes. In a normal eight hour workday plaintiff could sit at least six hours and stand or walk about four hours as long as normal breaks existed. (Tr. 708).

Dr. Becker opined that plaintiff would need to take unscheduled breaks about every two hours in order to monitor her blood sugar and have a snack. Plaintiff's legs would have to be elevated into the neutral position for at least four hours if she had to endure prolonged sitting. While she could occasionally lift less than ten pounds, Dr. Becker felt plaintiff could never carry anything ten pounds or heavier. She could rarely twist, stoop, or climb stairs and never crouch or climb ladders. He felt she had a significant limitation with regard to reaching, handling, or fingering. (Tr. 709). Plaintiff would likely have "good days" and "bad days" and should avoid exposure to most environmental hazards. (Tr. 710).

In March 2011, plaintiff's family practitioner Dr. Graham completed an evaluation regarding plaintiff's impairments. (Tr. 810-13). He diagnosed plaintiff

with hyperlipidemia, diabetes mellitus type 1, hypothyroidism, obesity, diabetic retinopathy, generalized anxiety, attention deficit hyperactivity disorder, acute renal failure, and coronary artery disease. Plaintiff had appropriate eye contact, posture, and gait. Her symptoms were primarily extreme fatigue and daytime somnolence which caused her to have difficulty concentrating and staying on task. (Tr. 810). Her mood was generally happy with a slightly flat affect. Dr. Graham felt plaintiff's thought process was logical. (Tr. 811). She was able to perform some simple math calculations and her abstract thinking was fair. (Tr. 811-12).

Dr. Graham opined plaintiff had serious limitations in her ability to independently initiate, sustain, or complete tasks due to her fatigue and her difficulty coping with stress. (Tr. 812). Dr. Graham stated plaintiff could not sustain working eight hours of work a day for five days. (Tr. 813).

### 5. RFC Assessment

State agency physician Dr. C. A. Gotway assessed plaintiff's RFC in November 2010. (Tr. 657-63). He reviewed medical records but did not examine plaintiff. He believed plaintiff could occasionally lift twenty pounds and frequently lift ten pounds. He opined that plaintiff could stand, walk, or sit for six hours out of an eight hour workday. She was limited to occasional stooping, kneeling, and crouching and could never climb ladders, ropes or scaffolds. (Tr. 657-58).

This opinion was seconded by Dr. James Madison of Disability Determination Services (DDS) in May 2011. (Tr. 829-31).

### 6. Consultative Examinations

Plaintiff underwent a psychological consultation in November 2010 with Dollean York-Anderson, Ph.D. (Tr. 640-41). Plaintiff was cooperative and had good eye contact and personal hygiene. Plaintiff's responses to questions were coherent and she was oriented to date, place, and time. She quickly and accurately calculated serial seven subtractions and accurately solved orally presented word problems requiring addition, subtraction, and multiplication. (Tr. 640). However, plaintiff could not perform division and she could only recall one of five objects after five minutes. Dr. York-Anderson's diagnosis was depression and she assigned plaintiff a GAF[2] score of 50. Dr. York-Anderson felt plaintiff appeared quite depressed. Dr. York-Anderson opined plaintiff's memory, concentration, and judgment were good and plaintiff appeared capable of managing her own funds. (Tr. 641).

Dr. Adrian Feinerman performed a physical consultative exam in November, 2010. Dr. Feinerman's diagnostic impression was hypertension, diabetes mellitus, arteriosclerotic heart disease, hypothyroidism, diabetic retinopathy, and degenerative joint disease. He opined that plaintiff's had no limitation of motion of any joint or spinal segment. Plaintiff was able to get on and off the exam table, tandem walk, walk on her toes, walk on her heels, squat and rise, hear normally, and speak normally. She was able to lift, carry, and handle

---

[2] 1The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

objects without difficulty and Dr. Feinerman felt she could manage her own funds. (Tr. 819-28).

## Analysis

Plaintiff argues that the ALJ improperly weighed medical opinion evidence, improperly assessed plaintiff's RFC, and erred in his credibility determination. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid*. See

also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Plaintiff argues the ALJ erred in his credibility determination by relying on her activities of daily living and not incorporating all of plaintiff's claimed side effects from her medications.

The Seventh Circuit has repeatedly held it is appropriate to consider activities of daily living but it should be done with caution. The ability to perform daily tasks "does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Here, the ALJ looked at plaintiff's function reports and testimony and determined her daily activities were not consistent with an inability to work. He noted that plaintiff's function reports did not indicate problems with personal care and she was able to prepare simple meals and go shopping. She testified to being able to perform light cooking and go shopping. Additionally, her grooming and hygiene were appropriate at examinations.

Plaintiff reported very limited daily activities that could all be performed at her own pace and with significant breaks. Her daily activities did not indicate in any way that she would have been capable of working an entire workday. If the ALJ had relied solely upon plaintiff's activities of daily living in determining

plaintiff's credibility his analysis would have been insufficient. However, this Court agrees with the Commissioner's argument that ALJ Janney considered the other appropriate factors in making his credibility determination, and therefore his credibility determination stands.

For example, the ALJ presented a detailed analysis of plaintiff's objective medical history. He looked at plaintiff's history of cardiac symptoms. He stated plaintiff had no active cardiopulmonary disease, and doctors' notes showed she was improving. Additionally, he looked at plaintiff's edema and heart rate. Plaintiff denied edema in March and August of 2012. (Tr. 40). While plaintiff claimed her hands experienced swelling, the records show plaintiff's edema was limited to her lower extremities and not global in nature. (Tr. 42). Her blood pressure and hyperlipidemia have generally been well controlled on medications. The ALJ noted the record showed plaintiff's cardiac condition had not been impacted by her obesity. He looked at plaintiff's hypothyroidism and noted her treating endocrinologist stated she was doing well and her energy level was good. (Tr. 41).

The ALJ looked at plaintiff's diabetes. He acknowledged her instance of acidosis and renal failure but also stated she had not followed her diet consistently. The record showed plaintiff had a history of non-compliance. Her blood sugar levels improved when she followed a dietary plan. (Tr. 41). The ALJ also took note of plaintiff's mental impairments. He stated that plaintiff had

generally normal mental status examinations and never received inpatient or outpatient psychiatric services. (Tr. 43).

The ALJ analyzed plaintiff's medications and additional treatment. He determined plaintiff was prescribed many of her medications for several years which was indicative that the medications were effective. Plaintiff reported that several of her medications made her tired and lethargic. However, the ALJ noted plaintiff's energy level was "good" in 2012 and that her medications were never changed due to their side effects. (Tr. 44). Plaintiff's willingness to pursue specialized affordable care weighed in her favor. However, she had not required hospitalization since 2010 and had not received treatment for her mental impairments. Plaintiff argues the ALJ should have given more weight to her testimony that Lipitor caused her to have muscle spasms. These claims are not substantiated by the record. Plaintiff never complained of muscle spasms to a doctor or requested to be taken off of Lipitor.

ALJ Janney finally looked at plaintiff's work history. He determined she had a consistent work history and that she was seemingly motivated to work. While this factor worked in her favor, the other evidence he discussed outweighed this in his credibility determination. (Tr. 47)

The ALJ clearly took the appropriate factors into consideration when determining plaintiff was not entirely credible. The Seventh Circuit has held that "not all of the ALJ's reasons have to be sound as long as enough of them are, and here the ALJ had multiple other reasons for discounting plaintiff's credibility.

*Halsell v. Astrue*, 357 Fed. Appx. 717 (7th Cir. 2009). The ALJ did not just look at negative factors but considered ones that worked in plaintiff's favor as well. He built the requisite logical bridge to his findings and therefore his credibility determination stands. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Plaintiff's next argument is that the ALJ erred in forming her RFC. An RFC is "the most you can still do despite your limitations." 20 C.F.R. §1545(a). In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record." *Ibid*.

Plaintiff argues that the ALJ did not identify the evidentiary basis he used in forming his RFC assessment. Along these lines, she argues that the ALJ rejected all the medical evidence and plaintiff's testimony and therefore created an "evidentiary deficit" which caused him to make an independent medical finding in forming the RFC. This Court disagrees.

The ALJ did not "reject" all of the medical evidence on file. He analyzed the opinions and gave them each a certain amount of weight. The ALJ did not assign all of the medical opinions "no weight" but rather "little weight" or "reduced weight." He used portions of the medical opinions he found supported in the record when he formed his RFC. For example, he included the limitations on standing, walking, and hazards found in Dr. Becker's opinion. The ALJ included the limitations from the state agency doctor's RFC regarding climbing, stooping, kneeling, and crouching but decided to form a more restrictive RFC overall. (Tr. 39, 707-710, 657-63).

He then looked at the rest of the record in forming his opinion. He considered plaintiff's testimony as well as a function report from her and her mother in law. He found some of plaintiff's claims to not be credible, such as her level of fatigue. However, he found other portions of her testimony to be credible, like her inability to multi-task. (Tr. 44-45). He included this in his RFC with regard to plaintiff's inability to work in a production or quota-based environment or in a job with frequent shifts in work tasks. (Tr. 39, 45).

The ALJ is required to assess all the evidence on file, both medical and nonmedical, and determine an RFC. *Diaz v. Chater*, 55F.3d 300, 306 (7th Cir. 2005). His RFC determination was not error as it was well reasoned and supported by the record.

Plaintiff's final argument is that the ALJ inappropriately weighed the opinion of Dr. Becker, plaintiff's treating endocrinologist. The ALJ is required to consider a number of factors in weighing a treating doctor's opinion.   The applicable regulation refers to a treating healthcare provider as a "treating source."   The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not</u>

> <u>inconsistent with the other substantial evidence in your case record,</u>
> <u>we will give it controlling weight.</u> [Emphasis added]

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

Plaintiff contends that the ALJ failed to consider the factors from 20 C.F.R. § 404.1527(c) in determining how much weight to give Dr. Becker's opinion. She argues plaintiff had seen Dr. Becker for ten years, Dr. Becker was aware of the totality of plaintiff's impairments, Dr. Becker was a specialist, and his opinions were consistent with portions of the record. Contrary to plaintiff's belief, the ALJ need not analyze every factor. The Seventh Circuit has held that the ALJ has not erred when discussing only two of the relevant factors in 20 C.F.R. § 404.1527(c). *Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008). Here, the ALJ opines that Dr. Becker's opinions are neither consistent nor supported by the records, which are two sufficient reasons outlined in the statute. However, the ALJ erred in this

analysis of supportability and consistency and he therefore inappropriately weighed the doctor's opinion.

First, the ALJ determined plaintiff's record did not indicate an inability to handle stress or miss more than one day of work per month. The ALJ relies upon the mental status examination performed by the consulting psychologist, Dr. York-Anderson, and treatment notes from plaintiff's family physician, Dr. Graham. (Tr. 46). This Court agrees with plaintiff that the ALJ failed to acknowledge evidence that supported Dr. Becker's opinion. As plaintiff points out, Dr. Graham's treatment notes do indicate plaintiff had difficulty with anxiety as she experienced palpitations and apprehension. (Tr. 785, 788).

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). The ALJ impermissibly "cherry-picks" portions of Dr. Graham's records focusing only on the treatment records that indicate plaintiff was doing well.

Plaintiff also points out that the Commissioner and the ALJ cited consultative psychologist Dr. York-Anderson in support of the notion that plaintiff's memory, concentration, and judgment were good. While Dr. York-Anderson did note this, she also noted plaintiff was "quite depressed."

Additionally, plaintiff points out that the ALJ and the Commissioner improperly assume Dr. York-Anderson would have determined plaintiff could perform low stress work. This is error. The Seventh Circuit has held that when an evaluation does not include a functional assessment the report cannot be used to support specific limitations within an RFC. *Suide v. Astrue*, 371 Fed. Appx. 684, 690 (7th Cir. 2010). Here, Dr. York-Anderson never opined as to plaintiff's functional capacity. Assuming she felt plaintiff could perform low stress work was inappropriate.

The ALJ then discussed Dr. Becker's opinion that plaintiff needed to elevate her legs and concluded that the record did not support this claim. The ALJ primarily relies on the fact that plaintiff normally had trace edema and one doctor's note indicated it may be related to diet. (Tr. 46). Plaintiff argues that several portions of the record contain evidence that plaintiff's edema was at times severe, and she had pain in her legs and toes. Plaintiff also contends that the ALJ failed to identify evidence suggesting elevating the legs was inappropriate for even trace edema. This Court agrees. If the ALJ was unsure as to why Dr. Becker felt plaintiff needed to elevate her legs he had a duty to contact him. The Seventh Circuit has held that an "ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable. 20 C.F.R. § 404.1527(c)(3)." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004).

The ALJ also claims plaintiff's nephrologist classified the edema as primarily diet-related. (Tr. 46). This is inaccurate. Plaintiff's cardiologist referred

to her sodium intake when discussing her edema, and stated the edema became "pretty significant" when she had more salt in her diet. That same visit he prescribed a medication in order to alleviate the symptoms. (Tr. 849-53). While it was clear plaintiff needed to minimize her sodium intake, no doctor on record determined the swelling was primarily diet-related.

The ALJ discounts Dr. Becker's conclusion that plaintiff had difficulty reaching, handling, or feeling stating that it inconsistent with the record as a whole and his own treatment notes. The ALJ noted that the consulting physicians indicated plaintiff had no difficulty in these areas. Additionally, Dr. Becker's notes failed to indicate plaintiff had pain, numbness, or upper extremity neuropathy. After establishing Dr. Becker's opinion was not supported the ALJ then contradicts that opinion and explains how plaintiff probably does have limitations with regard to reaching, handling, and fingering due to her bypass graft surgery and her diabetes.

This Court agrees with plaintiff that it is unclear how the ALJ could determine plaintiff's residual pain from surgery and diabetes could limit her ability to reach, handle, and finger, but Dr. Becker could not reach the same conclusion. It is possible that Dr. Becker included the limitations regarding reaching, handling, and fingering due to plaintiff's surgery and diabetes as well. Again, if the ALJ was unclear as to why Dr. Becker included this limitation, he had a duty to contact him for clarification. *Barnett,* 381 F.3d at 669. The ALJ's

own finding that plaintiff may have difficulty reaching, handling, and fingering is in direct opposition to his claim that Dr. Becker's opinion is unsupported.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009). While the ALJ was not required to give Dr. Becker's opinion controlling weight, he needed to adequately explain why the opinion was discounted. ALJ Janney simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)., citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying Christy C. Caraway's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. §405(g).

> The Clerk of Court is directed to enter judgment in favor of plaintiff.
> **IT IS SO ORDERED.**

DATE:  December 23, 2014.


s/ Clifford J. Proud

CLIFFORD J. PROUD

UNITED STATES MAGISTRATE JUDGE